Campbell, Chief Justice,
delivered the opinion of the court:
This case comes before us on motions of the claimant and the defendants for an amendment of findings as well as of the conclusions of the court heretofore made. The findings have been amended in some regards. In this connection it seems appropriate to call attention to the rule of the Supreme Court relating to findings of fact by this court. Eule Y provides that each party “ at such time before trial, and in such form as the court may prescribe,” shall submit to the court a request for findings of fact, and the rules of this court prescribe the form of such requests. Eule I of the Supreme Court provides that the Court of Claims shall make a finding of facts in the case “ established by the evidence, in the nature of a special verdict, but not the evidence establishing them.” In some of the requests by the defendants in this case these rules are not observed. The. requests are not in *506 the form prescribed by this court, and have taken a form which is not to be approved.
The plaintiff seeks to recover for work which he claims he was required to do in excess of his contract requirements for extra work and other items under a contract made by him with the United States relating to the constructing of the Denver Mint Building, Colorado. A large amount of evidence was taken, and there is much conflict in the testimony. The building was to be completed in 15 months from the date of the approval of the contractor’s bond; and though he was allowed to proceed with his work some time prior to the approval of the bond, he had made comparatively small progress after more than a year’s time had elapsed. It required practically 31 months longer to complete the work than was stipulated in the contract.
During the first year of the work and its continuance the plaintiff was repeatedly called upon to expedite the same, and the progress was so slow that he was threatened with an annulment of his contract. In June, 1899, the contract was annulled, but in a few days thereafter the surety on his bond and himself applied for a reinstatement of the contract, and he was allowed to proceed. As a matter of fact, it appears that after the reinstatement of the contract, and probably as an inducement thereto, the control of the work was not in the plaintiff but in another, who had financial interest with him.
Attempt is made in this case to show that the delays were principally owing to the conduct of the Government’s superintendent and other Government employees. The superintendent of construction is assailed upon the ground of incompetency. It is charged that he exacted too high a degree of finish on the granite work, and thereby caused delay and additional expense to the contractor. We have carefully considered the questions raised. It may be conceded that the superintendent placed a strict construction upon the specifications. They called for fine No. 6 cut work upon the granite; they also provided that the stone throughout the entire work should be “No. 1 selected stock, close-grained, of even texture, and free from all defects, in every way sat- *507 isfaetory to the Supervising Architect,” and each class to be of uniform color. In the contract the contractor covenanted and agreed “ that all of the materials used shall be of the very best quality, that all work performed shall be executed in the most skillful and workmanlike manner, and that both the materials used and the work performed shall be to the entire and complete satisfaction of the Supervising Architect.” The contract further provided “ that all materials furnished and work done under this contract shall be subject to the inspection of the Supervising Architect, the superintendent of the building, and of other inspectors appointed by the said party of the first part, with the right to reject any and all work or material not in accordance with this contract; and the decision of the Supervising Architect as to quality and quantity shall be final.”
It can not be said upon the facts that under the quoted terms of the contract and specifications the superintendent of construction either exceeded his duties or that he exacted better work than the plaintiff by his contract had undertaken to furnish. The witnesses agree that the work done resulted in an excellent building. The contract contemplated that kind of a building.
The principal delays were on account of the facts stated in the findings — that the plaintiff was unable and unprepared to cope with the task which his contract obligated him to perform. He had a great deal of difficulty in securing the necessary granite, notwithstanding the specification required him to point out in his proposal the location of the quarries from which the stone would be got and that the quarries “must be fully opened and capable of supplying the stone in sufficient quantities and at proper times.” He named as a quarry a place where practically no work had been done and at which it afterwards developed sufficient stone could not be had. He had to change from one quarry to another, and finally, after the loss of several months, he was allowed to get the stone from what is known as the Arkins quarry, which he had to open. Similarly he had trouble with the brick supply. He had furnished a sample of brick showing a better quality than the brick he contracted for, and *508 he made a contract with the concern, which he voluntarily canceled because of its inability to supply the necessary brick. These things, together with his inexperience and character of management, were principally responsible for his delays. We think he can recover nothing by reason of the alleged incompetency of the superintendent or by reason of the character of the finished stone.
When the plaintiff had canceled his contract for brick and it became necessary to secure other bricks the superintendent exacted, as conforming more nearly to the sample, a brick made by the Golden Pressed Brick Co. The contractor could have furnished another brick which would have met the requirements of the specification at a less price than the one chosen by the superintendent, which cost more. As a consequence a better brick was obtained than the specification called for, and we think the difference should be paid by the United States.
The defendants attack the court’s finding upon this phase of the case as well as upon the ground of the incompetency of the testimony. The gist of their argument is that the claimant has not produced the best evidence. It is, of course, a well-recognized rule that the best evidence should be produced, but it is frequently the case that by the form of objection to the testimony offered the production of the best testimony may be waived or not insisted upon by the adverse party. The plaintiff’s bookkeeper was examined and had in his possession statements which he had taken from the books. When he was interrogated with reference to this matter by plaintiff’s counsel, the defendants objected “ to the introduction of any evidence showing any loss sustained by Mr. McIntyre growing out of his contract in this case.” Upon inquiry the defendants’ counsel stated that he made no objection to the form of the proof if the witness stated that the paper was correct. This general objection to any evidence would, if sustained, be tantamount to saying that the plaintiff would not be able to make out a case at all. The phase of the testimony offered as being secondary evidence was expressly waived. It may be assumed that the books were accessible at that time, since the testimony was being *509 taken at Denver, where the work was done. If the defendants wanted the books, or more details, it was certainly within their right to have demanded them. We think it comes too late, 11 years after the testimony was taken (which was in 1906), for the defendants to insist now that the books themselves, or the vouchers upon which the book entries were made, should be produced, in the absence of an objection taken at the time, and especially when there was a waiver of the “ form ” of the testimony.
As the findings show, the plaintiff did not have a granite quarry at the place mentioned in his proposal, nor was he able for some time after work began to get a suitable granite. It was finally agreed that granite could be taken from a place called Arkins, a sample of which had been submitted by the plaintiff and approved by the Supervising Architect. In making the opening for the quarry at Arkins the plaintiff commenced quarrying some 60 or more feet below the point where the sample had been taken from. He did a great deal of work preparatory to getting out the stone. After working several months and opening the quarry sufficiently to secure stone he had delivered something over 600 feet of stone, which was accepted by the superintendent and was dressed for use. It was then ascertained that he was taking the stone from said lower place and not from the point at which the sample had been taken. He was thereupon required to make an opening at the upper point. The stone from the lower opening did not correspond in color to the stone shown by the sample, and when the change was made the stone wlrch had been delivered by him and accepted was rejected. If he had been allowed to prosecute the work at the lower opening he would ultimately have reached the ledge from which the sample had been taken; but if its color there had been as it was at the upper opening, he would have been met with the condition that the color did not correspond to that which he was taking out. The lower opening was more expensive than the upper one to the point of reaching the stone, because in the lower opening a great deal of the stone was necessarily discarded because of its defective condition, being near the surface. We think, however, that since he *510 was allowed to proceed at the lower point for several months, and some stone was taken therefrom which was approved and accepted, and afterwards rejected, as stated above, he should not be required to stand the loss of both openings, but that the Government should pay the expense of the lower opening which he was required to abandon. It appears, however, that in quarrying at the upper point he adopted a method which rendered the taking out of the stone a slow matter and which later prevented him from securing therefrom some larger pieces of stone which were necessary in the construction of the building. These larger pieces were, by agreement between him and the Supervising Architect, secured in Maine, he having proposed that the Maine granite would be furnished at no additional expense to the Government.
A claim is made on account of marble. The specification called for “ approved Colorado marble.” The plaintiff had named as the marble quarry in his proposal Salida. He subsequently notified the department that suitable marble could not be gotten at that place. When called upon by the plaintiff to suggest a color of the marble to be used the Supervising Architect stated that the marble should be cream white. The findings show that as a matter of fact no cream-white marble was to be found in the known or operating marble quarries in Colorado. There are circumstances shown in the record which indicate that there was doubt in the architect’s office while the specifications were being written as to whether the desired marble could be found in Colorado. The Supervising Architect indicated a willingness to accept light-yellow marble. It developed that marble of the color and of the sizes required could not be had in Colorado quarries. The result was that the contractor asked that he be allowed to furnish marble from Tennessee, Georgia, or Vermont. In granting permission to furnish marble from one of said States the Supervising Architect stated that it must be furnished without additional cost to the Government.
The specification having called for “approved Colorado marble,” the Government’s insistence is that the plaintiff assumed the obligation of furnishing any kind of Colorado *511 marble which the Supervising Architect might select. "Whether the expression means that the marble should be such as the Supervising Architect would approve or refers to an existing known marble that had been approved is at least open to debate. The contention of the Government is broader than can be sustained. We think it quite clear when the whole question is considered that the language of the specification did not authorize a requirement that would render performance impossible. The provision in question should receive a reasonable construction.
The specification called upon the bidders to state in their proposals the quarries from which they would take the stone to be furnished, this evidently to enable the department to examine the marble. It is true that the plaintiff mentioned a quarry which he later said was not suitable; but it is also true that the superintendent of construction and the plaintiff examined marble at Aspen with which the superintendent was pleased.. But this was rejected by the Supervising Architect because of its color. He designated as the color that should be used a cream white, and we are satisfied from the evidence that that colored marble could not be had. Later he informed the plaintiff that a light-yellow marble would' be acceptable. It can not be said from the evidence that a white marble could not be had in Colorado. It does appear, however, that it was impracticable to get the required marble from any of the known or operating quarries in the sizes required by the specification. We think a reasonable meaning of the requirement of the specification is that a color of marble such as could be secured from some known or operating marble quarry in Colorado would be approved, and that the contractor would have a right in making his bid to assume that such would be done. When, therefore, it developed that the color of marble which would be approved could not be had in Colorado from known and operating quarries, owing largely to the fact that the sizes prescribed could not be secured, it was open to the department, and perhaps its duty, to modify the specifications so as to conform it to the kind of marble which could be had. At least it had the right to do that; but we think that, under the facts *512 found, the department did not have the right to impose an additional burden upon the contractor of getting marble elsewhere when it was conceded that he could not get marble m Colorado that would be approved. The plaintiff asks the difference in freight from Tennessee to Denver over and above what the freight would have been from the Aspen quarry, upon the assumption apparently that the cost of the marble in Tennessee and in Colorado would have been the same. The relative cost of marble from Colorado and Tennessee is not shown, nor indeed could be, in view of the finding that the known or operating quarries in Colorado did not have it. We think that the difference in cost of freight should be borne by the Government.
A claim is made on account of additional expense to the plaintiff occasioned by a change in the detail drawings, the expense being an additional sum required to do the extra cutting of molding on account of said change. The contract provided that no claim for compensation for any extra materials or work could be made or allowed unless the same was specifically agreed upon in writing or directed by the Government. Under this provision of the contract the plaintiff 'can not recover for said item.
The plaintiff claims the expense of getting granite from Maine which went into the upper members of the cornice. The necessity for getting the Maine granite grew out of the fact that the plaintiff could not get the sizes required from the Arkins quarry. The findings show that the failure to get the proper sizes from the Arkins quarry was because of the method which the plaintiff had adopted in quarrying at that point. Having brought about the condition himself he proposed to furnish granite from Maine, and the proposition was accepted. He can not, therefore, recover on that item.
An item of expense for replacing arches on the coal vault is claimed. We think the plaintiff is clearly entitled to payment for said work because as originally done he followed the instructions of the inspector, though his own representative protested that the method would not be satisfactory. When it developed that the work had been done wrong and plaintiff’s method of doing it originally was adopted, we *513 think he should be paid for the work necessary to replace that which was defective.
The call for proposals for the building, which, with the specifications, are made a part of the contract, stated that the bidders must understand that a provision for liquidated damages would be inserted in the contract providing for $20 for each and every day’s delay in the completion of the work caused by the contractor, “ subject, however, to the discretion of the Secretary of the Treasury,” and that the contractor would be entitled to one day in addition to the stipulated time for each and every day’s delay caused by the Government. The contract in this case was made in 1898, and therefore prior to the act of June 6,1902, 32 Stats., 326, which expressly provides that the Secretary of the Treasury can remit the whole or any part of liquidated damages “ as in his discretion may be just and equitable,” and in contracts contemplated by said act it is unnecessary for the United- States to prove actual or specific damages, “but such stipulation for liquidated damages shall be conclusive and binding upon all parties.” While this contract may.be unaffected by said act we think that the provision above mentioned relative to the matter of liquidated damages being in the discretion of the Secretary of the Treasury was sufficient to justify the action that was taken in this case. It was recommended to the Secretary by the Supervising Architect, and approved by the former, that the liquidated-damage clause be not enforced and, on the other hand, that the plaintiff be charged with the actual cost to the United States of maintaining its force at the building during the period of delay. This sum was much less than the liquidated damages would have been at the rate mentioned in the contract. A voucher was accordingly made out charging the plaintiff with the sum of $10,601.21 as said actual cost, and after deducting that sum from the balance shown due the plaintiff he received a voucher for the difference — something over $14,000. The Secretary having acted in accordance with what he evidently construed the contract to authorize, and the plaintiff having accepted the result without any protest, we think it is too late for him now to undertake to correct it even if it be conceded that the Secretary had no right to make any change in the amount of liquidated *514 damages. Tbe defendants at tbe original bearing of tbe case sought to sustain the Secretary’s action. On tbe other hand, tbe plaintiff’s contention that he should be allowed to recover the sum so deducted because the provision of the contract is for a penalty and not liquidated damages is plainly untenable for the reason that the clause does not provide for a penalty and for the further reason that if construed to be a penalty the defendants would yet be allowed to recover their actual damages produced by the delay, and said item includes actual damages.
Judgment will accordingly be rendered in favor of the plaintiff for the sum of $16,792.81; and it is so ordered.
All of the judges concur.